## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| NATHAN B. SWIFT, <br> 2306 West 17th Street <br> Apartment 514 <br> Cleveland, Ohio 44113 <br><br> Plaintiff <br><br> v. <br><br> PREVENT BIOMETRICS, INC. <br> 4530 West 77th Street <br> Edina, Minnesota 55435 <br><br> Also serve: <br><br> PREVENT BIOMETRICS, INC. <br> c/o Cogency Global, Inc. <br> 850 New Burton Road <br> Suite 201 <br> Dover, Delaware 19904 <br><br> Defendant. | CASE NO. <br><br> JUDGE <br><br><br><br><br> **COMPLAINT** <br> (Jury Demand Endorsed Hereon) |

Nathan B. Swift (referenced herein as "Swift") hereby states and alleges for his Complaint against Prevent Biometrics, Inc. (referenced herein as "PBI" or Defendant") as follows:

## NATURE OF THE CASE

1. Swift brings this action to recover unpaid hourly and overtime wages, as well as damages for retaliatory discharge, breach of contract, and violation of Ohio wage law.

2. PBI initially employed Swift under an Agreement Regarding Employment (the "Employment Agreement"), and paid him hourly wages and overtime. PBI then determined that it could enjoy a business advantage under Minnesota law if it reclassified Swift as an independent contractor, and consequently required Swift to sign a Contractors Services Agreement (the "CSA"). Under the CSA, PBI improperly construed Swift as exempt from the requirements of the Fair Labor Standards Act ("FLSA"), paid Swift's salary that varied depending upon the hours worked, and stopped paying him overtime wages for hours worked in excess of 40 per week.

3. Other than the failure to pay overtime, the terms and conditions of Swift's employment were the same under the CSA as they were under the Employment Agreement. That is, PBI assigned Swift the same duties and hours, and the supervision of his work, remained unchanged. And PBI promised to provide Swift with paid time off ("PTO") in an amount commensurate with the unpaid overtime that PBI required Swift to work.

4. PBI also withheld payment from Swift for hours worked between February 5, 2017 and April 5, 2017 in retaliation for his initial refusal to sign the CSA.

5. In late 2017, PBI sought to restructure Swift's employment engagement to "as needed" status. When Swift asked about compensation for his accumulated PTO/overtime, PBI terminated his employment, and offered him a "severance" package under which PBI offered to pay an amount that Swift had identified as reflecting the value of his PTO. Moreover, PBI refused to pay Swift for his last two weeks of work, and declined to respond to his inquiries regarding the status of his pay.

## PARTIES

6. Swift is a resident of the State of Ohio, and was employed by PBI at its Cleveland, Ohio facility, located at Lutheran Hospital on Cleveland's Near West Side.

7. PBI is a Delaware corporation, with headquarters in Minnesota and facilities in Ohio. PBI was initially associated with the Cleveland Clinic, and is in the business of developing concussion impact technology for use in mouth guards worn by athletes.

## JURISDICTION AND VENUE

8. Jurisdiction in this Court is proper based on diversity of citizenship under 28 U.S.C. §1332(a)(1). There exists complete diversity among the parties, because Swift is an Ohio resident, and PBI is a Delaware corporation with headquarters in Minnesota.

9. Additionally, the amount in controversy exceeds $75,000, as the damages, including unpaid overtime and legal fees will likely exceed that amount.

10. Jurisdiction is proper based on a federal question under 28 U.S.C. §1331.

11. Venue is proper in this Court under 28 USC §§1391(b)(1)-(2).

12. This Court has personal jurisdiction over PBI because the conduct and events at issue was directed toward an Ohio resident, and/or largely occurred within the Northern District of Ohio.

13. This Court has supplemental jurisdiction over Swift's state-law claims pursuant to 28 U.S.C. § 1367(a).

## STATEMENT OF FACTS

14. Plaintiff restates all prior allegations as if fully rewritten herein.

### *PBI's Employment of Swift.*

15. PBI initially engaged Swift under an Agreement Regarding Employment, a true and accurate copy of which is attached hereto as Exhibit A, and referenced herein as the "Employment Agreement."

16. The effective date of the Employment Agreement was July 27, 2016.

17. The Employment Agreement identifies Swift as an "employee of the Company."

18. PBI paid Swift an hourly wage under the Employment Agreement, and also paid Swift an overtime premium for hours worked in excess of 40 per week.

19. On or around February 8, 2017, PBI sought to require Swift to enter into a Contractor Services Agreement, a true and accurate copy of which is attached hereto as Exhibit B, and referenced herein as the "CSA."

20. Under the CSA, PBI paid Swift a fixed daily amount of $240, and did not pay him overtime wages.

21. Under the CSA, PBI did not pay Swift overtime wages, but rather compensated him for overtime hours with PTO in an amount reflecting the overtime hours that he worked.

*Swift's duties.*

22. During his tenure with PBI, Swift's primary duties were not exempt from the requirements of the FLSA.

23. PBI engaged Swift to support the development of mouth guards, equipped with accelerometers that detect sports-related head trauma.

24. The accelerometers are designed to record motion and speed associated with an athlete's head movements, and to indicate when such motion is likely the result of impact associated with concussions or other serious brain trauma. The accelerometers and associated equipment and parts are referenced herein as the "Devices."

25. PBI tasked Swift with work in three primary areas: assisting with gathering data generated in field tests; assisting with refinement of PBI's methods for analyzing impact data; and conducting tests and recording results under protocols developed by his supervisors.

*Gathering data in the field.*

26. From time to time, PBI sent Swift to support field tests, in which PBI personnel observed athletes using the Devices, and recorded data and videotaped the events for subsequent analysis.

27. During field tests, Swift was charged with tasks that included, depending upon the particular test:

    a. bringing the Devices to the testing location;

  b. arranging mouth guards with identification labels for use by the athletes;
  c. dealing with issues arising from ill-fitting mouth guards, *e.g.* those that were too large or too small for the designated athlete;
  d. activating the Devices;
  e. ensuring that iPads used for data collection were functioning;
  f. operating a video camera to capture the specific athletes using Devices for matchup with data;
  g. collecting the Devices and associated gear following the field test;
  h. backing up data and review for errors; and
  i. filling out online reporting forms for emailing to PBI.

*Assistance with impact data and testing review.*

28. Using commercially available software, PBI has developed algorithms, or code, to distinguish between data reflecting normal, or non-injurious, impact, and impact likely resulting in injury to the athlete.

29. Upon information and belief, these algorithms were developed largely by Adam Bartsch, Ph.D. ("Bartsch"), and Sergey Samorezov ("Samorezov").

30. Bartsch has served as PBI's Chief Science Officer since July, 2017, and served as a Science Advisor with the company for approximately two years before that time.

31. Samorezov is employed with the Cleveland Clinic as a Research Engineer, and worked with PBI in connection with the company's initial relationship with the Cleveland Clinic.

32. Swift reported to Bartsch and Samorezov during his employment with PBI.

33. Under the direction of Bartsch and Samorezov, Swift tested the accuracy of PBI's predictive algorithm in order to identify the frequency of inaccuracies, *i.e.* to

6

identify the occurrence of false positive and true positive results. True positive results occurred when an identified positive reading arose from actual head impact. False positive results arose when the data indicated an event, but the event was something other than head motion associated with potential injury.

34. In order to test the accuracy, Swift reviewed video and real time data, and compared it to the data generated by PBI's algorithms. Swift then recorded the results in spreadsheets, which he provided for review by Bartsch.

35. Upon review of the data, Bartsch would direct Swift to make specific adjustments to the testing parameters in order to winnow out inaccuracies.

36. From time to time, Bartsch would also direct Swift to adjust specific functions of the code, such as widening or narrowing high pass or low pass filters.

37. Swift lacked substantial training and experience in code writing, and thus depended upon explicit direction from Bartsch or Samorezov to accomplish the data and testing work described above.

*Circuit board calibration*.

38. Bartsch and Samorezov developed protocols under which PBI would test the accuracy of the mouth guard accelerometers, using a slider device on which mouth guards would be dropped from specific heights. The protocols provided a method for comparing data generated by the accelerometers against reference data known to be accurate, thus identifying and quantifying data errors from the accelerometers.

39. Swift was charged with executing the test protocol, which involved setting up the slider test, capturing data, and observing error rates.

### *Change to independent contract status.*

40. Swift attended a meeting in early February, 2017 in Cleveland, with other employees and PBI executives.

41. Following the meeting, Michael Shogren ("Shogren"), PBI Vice President for Business Development, told Swift and other employees that the company intended to change their status from employees to independent contractors.

42. Shogren further stated that the reason for the change was to enable PBI to take advantage of Minnesota's "Angel Tax Credit" program.

43. As Shogren explained, to enjoy the benefits of the Angel Tax Credit, PBI's workforce had to be comprised of at least 51% Minnesota residents.

44. Subsequently, PBI required Swift to enter into the CSA.

45. Although Swift did not sign the CSA until April 5, 2017, PBI changed Swift's status from W2 employment to independent contractor as of February 8, 2017, the date on the face of the CSA.

46. Aside from the loss of overtime wages, Swift's duties with PBI were unaffected by the change to the CSA.

47. As a result of the change, Swift worked overtime hours without lawful compensation.

### *Threats and termination.*

48. Swift had reservations concerning the CSA, and he and several colleagues initially declined to sign the document after receiving it on or after February 8, 2017.

49. Although Swift declined to sign the CSA, he continued to work for PBI, and PBI was aware of his work.

50. Despite knowing that Swift was working, PBI refused to pay Swift for his work between February 8, 2017 and April 5, 2017 in retaliation for his refusal to sign the CSA.

51. In late March, 2017, PBI CEO Steve Washburn ("Washburn"), Shogren, and Chief Technology Officer Michael Lacey ("Lacey") called a meeting with Swift and his colleagues in Cleveland.

52. In a separate meeting, Shogren shouted at Swift and his colleagues, demanding that they sign the CSA or be fired, and threatening that any employee who failed to sign the CSA would be terminated, and that PBI would have no obligation to pay the employees for hours worked since February 8, 2017.

53. Shogren additionally admonished Swift and his colleagues that the work they were doing for PBI was low-value, and "easy" work, and that the terms offered by PBI were generous.

54. Shogren also warned the employees against taking any legal action, asserting that the company would crush any effort to involve attorneys in the process.

55. Faced with the threat of not being paid for two months of work, Swift signed the CSA on April 5, 2018.

56. Regarding overtime, Shogren verbally promised Swift that although the company would not pay overtime, PBI would provide PTO in amounts commensurate with hours worked over 40 per week.

57. On November 30, 2017, Bartsch told Swift that PBI was reducing his engagement under the CSA, and that Swift and his colleagues would be placed on an as-needed basis as of December 16, 2017. Bartsch also provided Swift with final assignments and instructions to "tie a bow" on all work in progress.

58. In response, Swift asked Bartsch how he would be paid for his unpaid and unused overtime/PTO, and reminded Bartsch that the CSA provided for a 30-day notice of termination.

59. Several day later, Lacey wrote in an email that PBI was not bound by the 30-day notice provision, because it was not terminating the contract, but rather placing Swift on an as-needed basis.

60. In his email, Lacey inquired as to whether Swift could complete his final assignments by December 16, 2017, and requested an estimate of time needed.

61. Swift replied by email to Lacey, again requesting information as to the status of his overtime/PTO compensation, and explaining that the final tasks that had been assigned could not be completed earlier than December 29, 2017.

62. Lacey replied to Swift's email with a single sentence, inquiring as to the amount of overtime/PTO Swift estimated that he had.

63. Swift continued to work for PBI through December 29, 2017, with PBI's knowledge, performing duties as directed by Bartsch.

64. Swift also provided to PBI an accounting of his overtime hours.

65. Although Swift worked for PBI through December 29, 2017, he was not paid for the final two weeks of his tenure, *i.e.* for the weeks of December 18 and December 26, 2017.

66. On December 29, 2017, Swift received email from Lacey, directing him to stop all work, and informing him that his engagement with PBI was terminated.

67. Included in the December 29 email was a "Confidential Termination Agreement and Release, attached hereto as Exhibit C and referenced herein as the "Release."

68. Under the proposed terms of the Release, PBI would pay Swift $4,320 in consideration for, *inter alia*, Swift releasing any claims against the company, including claims under the FLSA.

69. The Release also required that Swift accept the terms and return an executed copy to PBI within 14 days of receipt.

70. Swift placed repeated telephone calls to Lacey over the ensuing two weeks in order to request the full payment for wages due to him, including unpaid overtime, and wages for his final two weeks of work.

71. Swift's telephone calls went unanswered, and he was left with no alternative but to file this action.

## COUNT I
## (FLSA Violations)

72. Plaintiff incorporates by reference the foregoing paragraphs as if fully rewritten herein.

73. PBI engaged Swift as an employee.

74. Swift's primary duties were those of a non-exempt employee.

75. PBI is an employer covered by the overtime requirements set forth in the FLSA and Swift was a non-exempt employee for purposes of 29 U.S.C. § 207.

76. During the relevant time periods set forth in this Complaint, PBI violated the FLSA by failing to pay Swift the legally mandated overtime premium for all hours worked in excess of forty (40) hours per workweek.

77. During the relevant time periods set forth in this Complaint, PBI violated the FLSA by failing to pay Swift the legally mandated hourly wage for all hours worked.

78. PBI knew that Swift was not exempt from overtime obligations imposed by the FLSA and PBI willfully withheld and failed to properly pay overtime and hourly compensation despite such knowledge.

79. The exact amount of compensation, including overtime compensation that PBI has failed to pay Swift is not known at this time, as many of the records necessary to make such calculations are in PBI's possession, or not kept by PBI.

80. PBI's failure to pay Swift overtime compensation as well as minimum wage for all hours worked is not based on good faith or any other reasonable grounds.

Pursuant to 29 U.S.C. § 216(b), Swift is entitled to liquidated damages in an amount equal to the compensation and/or overtime he has not already been paid.

81. Swift has been forced to file this action as a result of PBI's illegal actions of failing to pay Plaintiff the proper compensation. As such, Swift is entitled to attorney fees and costs incurred pursuant to 29 U.S.C. §216(b) in addition to unpaid wages, overtime, and liquidated damages.

## COUNT II
### (Ohio Wage and Hour Violations)

82. Plaintiff incorporates by reference the foregoing paragraphs as if fully re-written herein.

83. PBI violated Ohio Revised Code Section 4111.01 *et. seq.* by its failure to pay overtime and hourly wages.

84. PBI violated Ohio Revised Code Section 4111.01 *et. seq.* by its failure to maintain time records.

85. Swift is entitled to unpaid wages and overtime, liquidated damages, and attorney fees as a result of PBI's violation of Ohio wage and hour law.

## COUNT III
### (Violation of O.R.C. 4113.15)

86. Plaintiff incorporates by reference the foregoing paragraphs as if fully re-written herein.

87. For a significant period, PBI failed to properly pay Swift his semimonthly payment of wages in accordance with § 4113.15 of the Ohio Revised Code.

88. As a result of the foregoing, Swift is entitled to six (6) percent of the amount owed as a result of PBI's violation of § 4113.15 as liquidated damages, plus unpaid wages and overtime.

## COUNT IV
### (Retaliation/FLSA and Ohio Law)

89. Plaintiff incorporates by reference the foregoing paragraphs as if fully re-written herein.

90. Swift undertook protected activity when he initially refused to sign the CSA, which improperly denied him overtime pay, and when he sought to be reimbursed for his PTO/overtime, which PBI promised him.

91. PBI was aware of the protected activity.

92. PBI retaliated against Swift by refusing to pay him for his work when he balked at signing the CSA, and by terminating his employment when he requested that PBI make him whole for unpaid PTO/overtime.

## COUNT V
### (Unjust Enrichment)

93. Plaintiff incorporates by reference the foregoing paragraphs as if fully re-written herein.

94. In the last two weeks of his employment, Swift continued to provide services to PBI.

95. PBI knew, or should have known, of Swift's work on behalf of the company.

96. PBI has been unjustly enriched as a result of Swift providing uncompensated services.

97. As a result of PBI's unjust enrichment, Swift is entitled to the value of his unpaid hours, as well as punitive damages and attorneys' fees.

WHEREFORE, Swift demands judgment against PBI for unpaid overtime, liquidated damages, prejudgment interest at the statutory rate, post-judgment interest, attorney's fees, damages, punitive damages and costs, and all other relief to which he is entitled.

Respectfully submitted,

/s/ Max E. Dehn
Max E. Dehn (0079600)
CAVITCH, FAMILO & DURKIN Co. LPA
1300 East Ninth St. – 20th Floor
Cleveland, Ohio 44114
Telephone: (216) 621-7860
Facsimile: (216) 621-3415
Email: mdehn@cavitch.com

*Attorney for Plaintiff*

## **JURY DEMAND**

Plaintiff demands that this case be tried before a jury of the maximum number allowed by law.

/s/ Max E. Dehn
Max E. Dehn (0079600)